# FIRST NATIONAL BANK, Respondent, v. VEGLAHN, Appellant.

## (231 N. W. 601.)

(File No. 6892.   Opinion filed June 24, 1930.)

*Max Stokes,* of Aberdeen, for Appellant.
*Buell F. Jones,* of Britton, for Respondent.

BROWN, P. J. At the time the controversy between the parties to this action arose J. E. Johnston was, and for twenty years prior thereto had been, engaged in the business of buying and selling live stock in Marshall and adjoining counties. In October, 1927, he had purchased about sixty hogs from farmers, which were delivered to him in the stockyards at Britton, where they were

levied upon by the sheriff of Marshall county by virtue of an execution on a judgment against Johnston. Plaintiff bank claiming to be the owner of the hogs brought this action in conversion against the sheriff. Before the case came to trial, by agreement between Johnston, plaintiff, and defendant, the hogs were sold, and $650 of the purchase price was retained by the sheriff, which was deemed sufficient to pay the execution against Johnston in the event that defendant should be successful in the action, the remainder of the purchase price was turned over to Johnston and the bank, and the action proceeded for the recovery of the $650 retained by the sheriff, the right to this money depending on whether the bank or Johnston was the owner of the hogs at the time of the levy. From judgment on a verdict for plaintiff, and from an order denying a new trial, defendant appeals.

During all the years that Johnston had been in this business he had kept a checking account in plaintiff's bank, had paid for live stock that he had bought by checks on this account and deposited the proceeds of sales which he made in the bank. All purchases were made in his own name, all shipments of stock that he sold were made in his own name, and remittances of the proceeds of sale seem to have been made direct to him until at least as late as January, 1927, at which time it is claimed by plaintiff that an arrangement was made whereby it became the purchaser of all live stock bought by Johnston and by virtue of which arrangement it claims to be the owner of the hogs levied upon by defendant. This arrangement, as testified to by W. S. Given, the cashier of the bank, was by oral understanding between him and Johnston in which he told Johnston that, because he owed debts to others, the bank could not continue to honor his checks for purchases of cattle unless they would receive one-half of the profits, and that "the business would have to be in our name and our ownership." However, the business was never carried on in the name of the bank, and, if the business was in the bank's ownership, that ownership was concealed from the public, as there was no change in the outward manner of doing business after this oral understanding from the manner in which Johnston had conducted it during the twenty years previously. And while it is claimed that the bank was to receive one-half of the profits and Johnston the other half, this was under an agreement that the one-half received by the bank would

be applied by them on a note which Johnston owed the bank, so that in reality Johnston still continued to get all of the proceeds.

█ █ Given, as a witness on behalf of plaintiff, was asked who was the owner of the hogs at the time they were levied on. An objection that this called for the conclusion of the witness was overruled and he answered the First National Bank of Britton. After it had developed on cross-examination that the claimed ownership of the bank was based on the oral understanding referred to, defendant asked a number of questions with the object of ascertaining if losses had been sustained on any of the shipments made subsequent to this oral understanding, and, if so, whether Johnston or the bank stood such losses. Objections by plaintiff to all such questions as not being proper cross-examination and not within the issues of the case were sustained. While it may be conceded that a witness may testify to ownership as an ultimate fact, yet the ground on which he bases such testimony is always a proper subject for cross-examination, and such cross-examination should not be unduly limited. In the instant case the question of who would ultimately have to stand the loss on purchases and sales in which loss occurred would have some bearing upon the question of who in fact was the owner of the hogs.

█ But irrespective of any errors in the exclusion of evidence offered by defendant, we think the judgment must be reversed, because the evidence is insufficient to justify a verdict in favor of plaintiff. Given testified, in substance, that Johnston had but one account with the bank in which was included not only the proceeds of the sales of live stock but his general personal account, that he wrote checks for his personal bills as well as for purchases of live stock on this account, that he paid for live stock purchased by him, including the stock levied upon in this case by checks charged against this account; that the stock so purchased was sold in his name, shipped in his name, and the checks therefor made payable in his name. The bank at no time appears to have exercised any control over the stock so purchased or sold by Johnston, and at no time did it exercise any act of ownership in reference to any of the stock in the possession of Johnston until after the levy was made by defendant in this case.

█ Conceding that both the bank and Johnston were acting in entire good faith, the relation between them was simply that of

debtor and creditor, the bank advancing the money or credit by which Johnston paid for live stock which he purchased on his own account, and the understanding between them that the title should be considered as in the bank was plainly for the purpose of security to the bank for the repayment of such advancements. Rev. Code, § 1549, provides that: "Every transfer of an interest in property, other than in trust, made only as a security for the performance of another act, is to be deemed a mortgage, except when in the case of personal property it is accompanied by actual change of possession, in which case it is to be deemed a pledge." If the understanding between Johnston and the bank had any validity whatever, it must have been as a transaction in the nature of a mortgage. Whether an oral hypothecation of personal property, without possession being delivered to the party secured, is valid in this state need not be determined, because, conceding the possibility of an oral chattel mortgage, it could certainly be given no more force than an unfiled mortgage in writing; and, under the provisions of Rev. Code, § 1583, a chattel mortgage is void as against creditors of the mortgagor, and subsequent purchasers and incumbrancers of the property in good faith for value, unless the mortgage, or an authenticated copy thereof, be filed in the office of the register of deeds in the county where the mortgaged property, or part thereof, is at the time situated. Under the provisions of this section, a judgment creditor who levies an execution on property covered by an unfiled chattel mortgage acquires a lien thereon superior to that of a holder of the mortgage, Kimball Co. v. Kirby, 4 S. D. 152, 55 N. W. 1110, and since, as we hold, an oral understanding such as that claimed to exist between Johnston and the bank can have no higher standing than an unfiled chattel mortgage, it follows that the lien acquired by levy of the execution held by defendant is superior to the claim of the bank.

The judgment and order appealed from are reversed, with directions to the trial court to enter judgment for defendant upon his motion for judgment notwithstanding the verdict.

POLLEY, SHERWOOD, and BURCH, JJ., concur.

CAMPBELL, J. (concurring specially). Generally speaking, an attaching creditor, unless by virtue of some statutory provision, acquires no better right to the attached property than his debtor

had, and the attachment is subject to any claims and equities which could be maintained against the debtor. Giving full credence to all statements of the witness Given, cashier of respondent bank, as the jury apparently did, and construing the course of dealings between the respondent bank and Johnston most favorably to respondent bank, as the jury apparently did, the situation after January, 1927, seems to me substantially this: Johnston was indebted to respondent bank upon a note. He desired respondent bank to finance him in the purchase of live stock for resale, out of the proceeds of which resale he was to repay the purchase money advanced by the bank, and, if a profit was made, receive one-half thereof and apply the other half upon his existing indebtedness to the bank. In January, 1927, it was agreed between Johnston and respondent bank that, if live stock was thus purchased for resale, the bank should "own the property," and that the property should be "in the bank's ownership." So far as the public was concerned Johnston continued to operate in his own name. When he purchased cattle he paid therefor by checks on respondent bank. Respondent bank paid those checks which sometimes did and sometimes did not create an overdraft. If any check or checks created an overdraft they were carried as cash items until resale of the live stock. When the live stock was resold Johnston issued his draft against the commission company payable to respondent bank. These drafts were delivered to the bank at the time shipment was made and carried in a special account. When the drafts cleared the bank took care of the overdraft, if any there was resulting from the honoring of checks given for purchase of the cattle, and, if any shipment realized a profit on the resale, the excess of the resale price over the purchase price was applied by crediting or paying one half thereof to Johnston and using the other half to reduce Johnston's existing indebtedness to respondent bank.

Looking at all the facts and circumstances, the most that can be said is that there was an attempt, conceding its entire good faith, between Johnston and respondent bank, by oral agreement between themselves, to transfer title to this live stock, as the same was from time to time acquired by Johnston, to respondent bank, without change of possession and for purposes of security.

The facts, construing them most favorably to respondent, show conclusively that security to respondent bank was the object, and

the sole object, of the attempted arrangement. It was meant to furnish to the respondent bank security that it should recover back its advancements, if any, for the purpose of purchasing the live stock, and also should receive one-half the profits thereof, if any, to apply on existing indebtedness owed it by Johnston.

Section 1549, R. C. 1919, reads as follows: "What May Be Deemed a Mortgage. Every transfer of an interest in property, other than in trust, made only as a security for the performance of another act, is to be deemed a mortgage, except when in the case of personal property it is accompanied by actual change of possession, in which case it is to be deemed a pledge."

If the attempted arrangement between Johnston and respondent bank had any validity whatever, it must necessarily, as a matter of law, be deemed a transaction in the nature of mortgage. Whatever the parties may have thought they were accomplishing, or whatever they may have chosen to call their transaction, that is the legal effect of it, if any. The transaction was at most an oral mortgage, or perhaps what might be termed an equitable mortgage, and equitable liens arising by agreement are recognized in this state. See Dorman v. Crooks State Bank, 55 S. D. 209, 225 N. W. 661, 64 A. L. R. 614, and cases cited. The bank, of course, could have no interest in the live stock until acquired from time to time by Johnston. Section 1529, R. C. 1919. But we need not consider in this case any questions regarding mortgage of after-acquired property. Neither need we consider in this case whether a valid mortgage upon personalty, whether legal or equitable, can rest in parol. It may well be contended that it cannot. See Jones on Chattel Mortgages (5th Ed.) § 2; Rev. Code 1919, §§ 855, 857, 1547, 522, 556, 1557, 1577.

Waiving that point entirely, and assuming the validity between the parties of an oral transfer of personalty for purposes of security without change of possession, certainly such mortgage of personalty resting in parol could not conceivably have any higher rank or value than an unrecorded chattel mortgage in writing between the same parties covering the same property.

Section 1583, R. C. 1919, provides as follows: "Mortgage of Personal Property Void Unless Filed. A mortgage of personal property is void as against creditors of the mortgagor, and subsequent purchasers and incumbrancers of the property in good faith

for value, unless the original, or an authenticated copy thereof, be filed by depositing the same in the office of the register of deeds of the county where the property mortgaged, or any part thereof, is at such time situated."

Under this section any mortgage of personal property (that is, as provided by section 1549, R. C. 1919, any transfer of an interest in personalty, other than in trust, made only as security not accompanied by actual change of possession) is absolutely void as to all creditors of the mortgagor who become such after the giving and before the filing of the mortgage and is conditionally void in its inception as to all prior creditors becoming absolutely void as to any such prior creditor who before the filing of the mortgage, in the words of the Supreme Court of North Dakota (Union National Bank v. Oium, 3 N. D. 193, 54 N. W. 1034, 1036, 44 Am. St. Rep. 533) "has armed himself with attachment or execution and levied on the property, or has in some other way secured a lien thereon." See Hollenbeck v. Louden, 35 S. D. 320, 152 N. W. 116; Brown Grain Co. v. Coughlin, 53 S. D. 66, 220 N. W. 151.

Upon the foregoing considerations I concur in the view that the judgment and order appealed from should be reversed, and the cause remanded, with directions for judgment on the merits in favor of appellant.